UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO.: 3:17-CR-151(SRU) |
| VS. | |
| RUFUS HOWELL | : JANUARY 19, 2022 |

**MEMORANDUM IN SUPPORT OF MOTION FOR
SENTENCE REDUCTION PURSANT TO 18 U.S.C. § 3582(c)**

**Introduction:**

> The essence of compassion is being able to imagine one's self in another's position; the better to become sensitive to the suffering and welfare of others. Compassion incorporates the concepts of mercy, pity, and justice. It is a tempering of how we feel by a rational sense of how we would like to be treated if we were in the same spot.

First Nat'l Supermarkets v. Retail, Wholesale & Chain Store Food Emples. Union 338, 118 F.3d 892, 899 (2nd Cir. 1997). Compassionate is defined as "feeling or showing sympathy and concern for others.[1]" While Compassionate Release is a misnomer, United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020), Mr. Howell's requested reduction must be read in this context. Prior to beginning his sentence in this matter Mr. Howell had no known kidney issues. However, since being incarcerated in February 2019, Mr. Howell has progressed from "abnormal creatinine levels" to chronic kidney disease ("CKD") stage 3 and he's progressing at a pace that kills, literally.

The undersigned counsel was appointed by this Court pursuant to a request from Mr. Howell regarding a sentence reduction. See, doc. #146. The undersigned understands this Court's familiarity with Mr. Howell as well as his prior requests for reduction of sentence. See, docs #108 – #146. This is not a case where civil remedies or an injunction will cure the issue. Rather, each day that passes places Mr. Howell one step closer to dialysis or a kidney transplant. Accordingly,

---

[1] https://www.google.com/search?q=compassionate&rlz=1C1GCEA_enUS933US933&oq=compassionate&aqs=chrome..69i57j0i433i512l3j46i175i199i512l2j0i512l2j46i175i199i512l2.3600j0j15&sourceid=chrome&ie=UTF-8.

Mr. Howell respectfully requests that this Court reduce his sentence as it sees fit so that he can obtain the requisite medical care that he cannot while an inmate in the Bureau of Prisons ("BOP") custody.

**Relevant Procedural History:**

Mr. Howell was arrested on or about July 6, 2017, and he remained in pretrial detention until January 12, 2018. PSR at 4. On August 24, 2018, Mr. Howell entered guilty pleas to counts one – unlawful possession of a firearm by a convicted felon and two – possession with intent to distribute heroin. Id. He remained on pretrial release conditions until his sentencing on January 3, 2019. On this date, the Court sentenced Mr. Howell to 66 months to serve on each count, concurrently, for a total effective sentence of 66 months. See, doc #95. Mr. Howell was given a self-surrender date of February 20, 2019. Id.

Mr. Howell's initial counsel filed an emergency motion to reduce sentence on or about April 23, 2020. See, doc #108. This Court denied the emergency motion finding that Mr. Howell did not establish extraordinary and compelling reasons, and even if he had, that 3553(a) factors warranted against granting said request. See, doc #115. On or about July 27, 2020, Mr. Howell's attorney filed a renewed motion for sentence reduction relying upon his CKD. See, doc. #120 - #123. This Court again denied Mr. Howell's request. See, doc. #126. Finally, Mr. Howell's attorney filed a third motion for sentence reduction with this Court (doc. #131 - #133), which was also denied. See, doc. #143.

**Mr. Howell's CKD and its Progression while in BOP Custody**

Mr. Howell's first known issue with a kidney problem came from a hospitalization while in BOP custody on June 12, 2019. See, attached medical records. However, there are no other notes, indications or treatments from that date to and through July 2020. On July 7, 2020, BOP records indicate that Mr. Howell was in dire need of a renal ultrasound as he had a provisional diagnosis of CKD. Id. Despite this diagnosis Mr. Howell's consult was soon cancelled as he was due to be transferred to another facility. Id. BOP records indicate that Mr. Howell's transfer was

not slated until August 19, 2020, which gave BOP at least one month to conduct the consultation. However, this dire request never happened.

On September 3, 2020, Mr. Howell complained about his CKD, and the records indicate that he was diagnosed with CKD "approximately one month ago" (although this diagnosis should've occurred over one year prior given the 2019 creatinine levels and his renal ultrasound), which was incorrect. Less than two weeks later, on September 16, 2020, BOP records indicate that Mr. Howell's "renal function" was "not normal", and he needed to be checked especially given his relatively young age for said results. Then, on October 1, 2020, BOP began administering Carvedilol 6.25 mg which is a medication associated with treating CKD. Merely two months later this dosage was doubled to 12.5 mg as Mr. Howell's CKD was raging and his condition was worsening.

On March 10, 2021, BOP also began to administer Losartan to Mr. Howell for his CKD, which progressed to stage 2 by this time. These notes also indicate Mr. Howell was suffering from a severe rash associated with his CKD and that an ultrasound was needed. Accordingly, an "urgent" nephrology consult was ordered. Despite this "urgent" request, as of April 13, 2021, BOP records indicate that no nephrology consult had been conducted. By May 15, 2021, more than two months after the request for a consult was made, Mr. Howell still had not received this "urgent" consult, and he was in the sick call complaining of right sided pain associated with his CKD. June 22, 2021, BOP records indicate that Mr. Howell was in desperate need of a nephrology consult which still had not occurred. Of even more concern is the notation in this record that iterates, "ultrasound of [Mr. Howell's] kidney performed in 06/2019 which showed thinning of the left kidney." This is the first mention of any prior renal ultrasound.

Finally, on or about October 12, 2021, Mr. Howell received a nephrology consultation with Dr. Chowdhury. Records indicate that by this time Mr. Howell was at CKD stage 3 and that he was taking both Carvedilol 12.5 mg and Losartan 50 mg. Dr. Chowdhury immediately discontinued Mr. Howell's Losartan as it could be leading to his CKD condition. On or about October 19, 2021, staff BOP reviewed the consult with Dr. Chowdhury with Mr. Howell, which

indicated a repeated ultrasound was needed to compare/contrast with the one conducted in June 2019 to see how far the CKD had progressed since then. This ultrasound was finally conducted on or about November 9, 2021 – far more than two years later.

**COVID-19 at FCI Danbury and Mr. Howell's Second Positive Diagnosis**

As the CDC indicates, a person "having chronic kidney disease of any stage can make you more likely to get severely ill from COVID-19." https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Currently, there are eighty nine (89) inmates and fourteen (14) BOP staff that are positive for COVID-19. https://www.bop.gov/coronavirus/. (Last accessed 1/8/2022).

Mr. Howell tested positive for COVID-19 in December 2020. While he initially refused a subsequent vaccination, this was solely due to his contracting COVID-19 within the previous ninety days. Thereafter, in April and May 2021, Mr. Howell received his initial two COVID-19 vaccinations. See, attached records.

On or about December 30, 2021, Mr. Howell's family reached-out to the undersigned indicating that Mr. Howell's current cell mate was COVID-19 positive. However, the BOP failed and refused to move or separate Mr. Howell from this individual. Then, on January 3, 2022, Mr. Howell's family alerted the undersigned that Mr. Howell had tested positive for COVID-19 again. After obtaining updated BOP medical records, it is clear that Mr. Howell is COVID-19 positive, again, merely one year after already contacting this disease. See, attached records.

**Legal Standard – Extraordinary and Compelling Reasons 3582(c)(1)(A)**

Under the First Step Act of 2018, federal prisoners may now petition courts directly for reduction of their sentences, and judges may grant such requests if "extraordinary and compelling reasons" warrant a reduction. See, First Step Act of 2018, Section 603(b), Pub. L. 115-391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)(i)). Previously, courts could modify sentences under § 3582(c)(1)(A)(i) only upon motion of the U.S. Bureau of Prisons (BOP). Since

the First Step Act was enacted, courts have granted relief under § 3582(c)(1)(A)(i) in numerous cases. Here, the Court has the authority to modify Mr. Howell's sentence because "extraordinary and compelling reasons" are present.

18 U.S.C. § 3582(c)(1)(A)(i) provides:

(1) in any case--

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

(i) extraordinary and compelling reasons warrant such a reduction; . . .

. . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i). Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements.

In United States v. Brooker, 976 F.3d 228, 234 (2d Cir. 2020), the court held that the First Step Act eliminated U.S.S.G. § 1B1.13's definition of "extraordinary and compelling reasons" when initiated by the defendant. Now, a district court is free to "reduce but not eliminate a

defendant's prison sentence or end the term of imprisonment but impose a significant term of probation or supervised release." Id. at 237. Thus, the Brooker court concluded that "the only statutory limit on what a court may consider to be extraordinary and compelling is that 'rehabilitation … *alone* shall not be considered an extraordinary and compelling reason.'" Id. at 237 – 238.

In United States v. Lizardi, 2020 U.S. Dist. LEXIS 188147 (S.D.N.Y. Oct. 9. 2020)(Engelmayer, J.), the court reduced a defendant's sentence despite his having no medical conditions relative to COVID-19.  The Lizardi court opined "Lizardi's term in custody has proven more arduous than the Court – or anyone – could have ever anticipated in 2014." Id. The court then held:

> A day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing.

Id. at *10; See also, United States v. Rodriguez, 2020 U.S. Dist. LEXIS. 181004, *8 (S.D.N.Y. Sep. 30, 2020)(Rakoff, J.)(finding that "onerous lockdowns and restrictions" due to COVID-19 has made the defendant's sentence "exceed" what the Court anticipated at the time of sentencing.). Thus, the court held:

> Although Lizardi cannot claim heightened vulnerability to COVID-19, his claim during the past seven months to have experienced heightened deprivation – and to have experienced unexpectedly punishing prison conditions – is credible.

Id. at *12; See also, United States v. Wooten, 2020 U.S. Dist. LEXIS 191940 (D. Conn. Oct. 16, 2020)(Underhill, J.)(granting a sentence reduction despite lack of any susceptibility to COVID-19); United States v. Sturdivant, 3:12-cr-00074(SRU), doc. entry #1349 (holding same).

**Legal Standard – Chronic Medical Conditions and 3582(c)(1)(A)**

In United States v. Rubio, 2021 U.S. Dist. LEXIS 123942, n.4 (N.D. Cal. June 15, 2021)(Armstrong, J.), the court found that BOP's inability to adequately care for an inmate in their custody is a valid basis for sentence reduction pursuant to 3582(c)(1)(A). In United States v. Miller, 2021 U.S. Dist. LEXIS 123594. *10 - *12 (N.D. Cal. July 1, 2021)(Breyer, J.), the defendant suffered from chronic hepatitis C and neck and back pain. While relying on U.S.S.G. § 1B1.13 comment n. 1(A)(ii) which Brooker eliminated, the Miller court held:

> Mr. Miller suggests that he is receiving inadequate medical care for his conditions. But assuming that is correct, section 3582(c)(1)(A) does not make all prisoners receiving inadequate medical care eligible for compassionate release. The relevant question is whether Mr. Miller is 'suffering from a serious… medical condition… that substantially diminishes' his ability 'to provide self-care within the environment of a correctional facility. That language refers to medical conditions that, by their nature, cannot be treated effectively in prisons.

Id. at *11 -*12.

In United States v. Malique Martin, 3:20-CR-260(JAM), the defendant plead guilty to one count of dealing in firearms without a license and possession of a firearm with an obliterated serial number. See, doc. #70. As a result, Mr. Martin was sentenced to 12 months and 1 day to serve on June 16, 2020. Id. Prior to his arrest and incarceration, Mr. Martin had several hand surgeries and caught a MRSA infection which caused him pain in his hand. Id. The only way to rectify Mr. Martin's painful condition was additional surgery that he could not obtain while in BOP care. Id. In granting Mr. Martin's sentence reduction, the court enumerated "his need for hand surgery and lack of access to adequate medical treatment in BOP custody constitute extraordinary and compelling reasons for a sentence reduction." Id. The court granted this reduction even though the MRSA infection was dormant and the pain non-life threatening. Id.

In United States v. Hossain, 465 F. Supp. 3d 114, 119 – 120 (N.D.N.Y. June 8, 2020), the court held, "an inmate with a chronic medical condition that has been identified by the Centers for Disease Control and Prevention ("CDC") as elevating the inmate's risk of becoming seriously ill

7

from COVID-19 may satisfy the standard of 'extraordinary and compelling reasons.'" See also, United States v. Biggs, 2020 U.S. Dist. LEXIS 216124 (M.D. Penn. Nov. 18, 2020)(finding same).

**The Exhaustion Requirements are Met in this Case**

18 U.S.C. § 3582(c)(1)(A)(i) provides in relevant part: "(1) in any case – (A) the court… upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the bureau of prisons to bring a motion on the defendant's behalf <u>or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier</u>. (Emphasis added). The statute is clear that a defendant must exhaust his administrative remedies or simply wait 30 days. In United States v. Haney, 2020 U.S. Dist. LEXIS 63791, *8 - *9 (S.D.N.Y. April 13, 2020)(Rakoff, J), the court expounded:

> Generally, Congress imposes exhaustion requirements in order to serve the twin purposes of protecting administrative agency authority and promoting judicial efficiency. <u>But the hybrid requirement in this statute – either exhaust or wait 30 days – substantially reduces the importance of the first purpose, as it allows a defendant to come to court before the agency has rendered a final decision.</u> Indeed, anyone familiar with the multiple demands that the BOP has faced for many years in this era of mass incarceration can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days of such request or, even if it did act, its review would be superficial. Congress was determined not to let such exigencies interfere with the right of a defendant to be heard in court on his motion for compassionate release, and <u>hence only limited him to 30 days before he could come to court in the ordinary course. Thus, the reduction of the wait period to a mere 30 days also unquestionably reflects a third purpose, i.e., congressional intent for the defendant to have the right to a meaningful and prompt judicial determination of whether he should be released.</u>

(Emphasis added, internal citations and quotations omitted). Other courts concur with the Haney rationale. See, United States v. Flenory, 2020 U.S. Dist. LEXIS 78602, *13 (E.D. Mich. May 5,

2020)(Lawson, J.); United States v. Russo, 2020 U.S. Dist. LEXIS 65390, *16 - *17 (S.D.N.Y. April 14, 2020)(Liman, J.).

As enumerated in Mr. Howell's first filing, doc. #109, Mr. Howell filed a request to the requisite parties, and they were denied. Subsequently, this Court then reviewed and decided the merits of Mr. Howell's Motion as well as two additional requests. The undersigned's appointment comes under the same docket number, and pursuant to the same requested relief as the initial filing. The initial filing occurred well-over nineteen months ago and the undersigned believes exhaustion has been met in this case.

**Analysis**

**The Court's Most-Recent Decision – Doc. #143**

The Court's last decision was clear: 1) Mr. Howell's Stage 3 CKD is not extraordinary and compelling; 2) Mr. Howell's vulnerability to illness from COVID-19 lacks persuasive force; and 3) even if Mr. Howell could establish extraordinary and compelling reasons, the 3553(a) factors weighed in favor of denying the requested reduction.

Since issuing this decision more than seven months ago, Mr. Howell's CKD has worsened, and he was recently re-infected with COVID-19 because of BOP's failure to quarantine and/or remove a positive inmate from Mr. Howell's shared cell. While the Court's most-recent ruling was clear, an objective review of Mr. Howell's medical care from February 2019 to the present clearly shows BOP is rendering inadequate medical care. As a result, this is an extraordinary and compelling reason for reduction of his sentence.

**BOP Medical Records Objectively Show Inadequate Medical Care**

First, there is a dearth of documentation as to how or why Mr. Howell had a renal ultrasound in June 2019. Second, this occurred merely four months after he entered BOP's care. The findings clearly indicate a concerning issue or condition with his left kidney. Despite this test and its finding, BOP has no records relating to Mr. Howell's CKD until July 2020, well over one year later. At that time, Mr. Howell was provisionally diagnosed with CKD stage 2, and a renal ultrasound and blood work were ordered. Despite the urgency of these requests, BOP cancelled the consultation due to a pending transfer. However, BOP had over one month to conduct this consultation and simply failed to prioritize Mr. Howell's condition. Then, in October 2020 Mr. Howell was placed on medication commonly used for those with CKD, Carvedilol. Within two months his dosage was doubled.

In March 2021 BOP placed an "urgent" nephrology consultation for Mr. Howell. In addition, BOP began prescribing Losartan 50 mg to Mr. Howell. Despite this "urgent" request, Mr. Howell did not receive a nephrology consultation until October 12, 2021, which is at least seven months after this "urgent" request and well-over two (2) years from the initial renal ultrasound. Additionally, the "urgent" renal ultrasound did not occur until eight months later: November 9, 2021.

**Glomerular Filtration Rate and CKD**

Glomerular Filtration Rate ("GFR") is the measurement used to determine kidney function. Knowing your GFR score enables your physician to figure out the stage of your kidney disease and plan the best possible treatment.

 https://www.upmc.com/services/transplant/kidney-pancreas/glomerular-filtration-rate-calculator?&?utm_mrid=mrid0702&utm_source=GOOGLE&utm_medium=cpc&utm_campaign=71700000037477855&utm_adgroup=58700004162372724&utm_term=gfr+score&utm_advertiserid=700000001755088&gclid=Cj0KCQiAweaNBhDEARIsAJ5hwbdA0aRGn5A8BYyI6StvSmX0bT8BSWC7FhdeP2cmZBIEo-_ppaDs1cgaAstSEALw_wcB&gclsrc=aw.ds

A GFR between 30 – 59 indicates CKD stage 3. Id. A person with CKD stage 3 is more likely to develop anemia, early bone disease or high blood pressure and should see a nephrologist. Id. A

GFR between 15 – 29 indicates CKD stage 4. Id. By the time a person reaches CKD stage 4, he will need dialysis or a kidney transplant. Id. The BOP records highlight the lack of proper overview of Mr. Howell's creatinine levels and GFR readings in the BOP records. The undersigned can only discern that: A) September, 2020 – creatinine 1.50 and GFR 51; B) January, 2021 - creatinine level was 1.50 with a GFR 51; C) March 20, 2021 – creatinine – 1.50 with a GFR 50; D) April 13, 2021 – Creatinine – 1.80 with a GFR 41; E) May 11, 2021 – creatinine 1.76 with a GFR 42; and F) August 21, 2021 – creatinine level – 1.62 with a GFR 47. Despite the drastic change in his GFR from September 2020 to August 21, 2021, the BOP records fail to show any additional monitoring of Mr. Howell's creatinine levels or GFR after August 21st. This seems contrary to the trend of monitoring Mr. Howell's condition by conducting monthly or bi-monthly testing from January through August 2021.

The BOP's failure to follow its own urgent referral for a renal ultrasound is astounding especially given his continually growing creatinine levels and resultant GFR readings. Additionally, Mr. Howell's CKD was even much worse off because not only wasn't he receiving the proper nephrology care and support, but the BOP began giving him an improper medication (Losartan) that worsens and will further damage his kidney function.

Once Mr. Howell finally received his "urgent" nephrology consultation, Dr. Chowdhury immediately discontinued Mr. Howell's Losartan medication. Dr. Chowdhury iterated that "I will hold Losartan secondary to elevated creatinine in last 6 months." This is because Losartan can detrimentally affect renal function, especially in a person with CKD. See, Acute Kidney Failure and Losartan: A Recently Observed Event of Antagonists of Angiotensin II AT1 Receptors, P. Dionisio, et. al., https://pubmed.ncbi.nlm.nih.gov/11227361/; The Effect of Losartan on Renal Function and Metabolic Risk Factors in Essential Hypertensive Patients, L. Mischchenko, et. al.,

https://journals.lww.com/jhypertension/abstract/2010/06001/the_effect_of_losartan_on_renal_function_and.1493.aspx#:~:text=Losartan%20treatment%20promotes%20to%20BP,EH%20pts%20with%20hypertensive%20CKD.

    Objectively reviewing Mr. Howell's CKD while in BOP custody establishes the BOP's inability to adequately care for Mr. Howell's CKD. He had no known kidney issues prior to entry into their care, and now he is well within the CKD stage 3 realm. Studies show that a person with CKD stage 3 needs a nephrologist and can develop anemia, bone disease or high blood pressure. The BOP records clearly indicate he is already hypertensive secondary to his CKD. In addition, as Mr. Howell's CKD continues to decline, he will be knocking on the door of CKD stage 4 which mandates dialysis or a kidney transplant. We have a chance, here and now, to thwart Mr. Howell's CKD from continuing to ravage his body before it is too late, and he needs a new kidney.

**Weighing the 3553(a) Factors**

    18 U.S.C. § 3553(a) specifies the factors courts are to consider when imposing a sentence. The list of factors is preceded by what is known as the parsimony principle, a broad command that instructs courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation. Dean v. United States, 137 S. Ct. 1170, 1175 (2017). The parsimony principle has deep roots in American soil that are centuries old. Our founding fathers relied upon the work of the Italian criminologist Cesare Beccaria, who borrowed the concept from Montesquieu, as well as the English philosopher Jeremy Bentham.

    Amid this pandemic there is a constant consensus among the courts that being incarcerated is much more arduous and grueling than any time prior. Many courts have reduced sentences based solely on this basis condition, despite the individual evidencing no susceptibility to COVID-19.

See, Lizardi, 2020 U.S. Dist. LEXIS 188147 at *10. In fact, this Court in Wooten, 2020 U.S. Dist. LEXIS 191940 and Sturdivant, 3:12-CR-0074 (SRU), granted sentence reductions echoing the Lizardi rationale. Since February 2019, Mr. Howell has contracted COVID-19 not once, but twice and his CKD is rampant without proper treatment. If no reduction is granted, then Mr. Howell will be left with nothing but hopes or prayers that he exits BOP custody without need for dialysis or a new kidney.

Just punishment and deterrence are satisfied with the incarceration Mr. Howell has already served. Not only have his conditions been more onerous than this Court ever imagined when it imposed sentence in January 2019, he has contracted COVID-19 twice and his body is devastated beyond repair by CKD. He's paid enough for his conduct in this case, especially given the conditions of his incarceration. In addition, through the lengthy sentence that was imposed in January 2019, and through the recent denials for reduction in sentence, Mr. Howell understands how lucky he will be if a reduction is granted. Thus, both just punishment and deterrence are satisfied with a time-served sentence.

As for rehabilitation, this Court has an objective window to view Mr. Howell. In 2018, against the advice of probation and the government, this court granted Mr. Howell pretrial release. During his release period, Mr. Howell showed he can abide by conditions of release and that he could grow and better himself through gainful employment. Thus, a sentence of time served also satisfies this 3553(a) factor.

The Court's prior two rulings find that even if Mr. Howell's CKD or myriad other medical conditions qualified as extraordinary and compelling, it felt that he still poses a danger to the safety of the community or those within it. See, doc. #143 and #115. However, this Court gave Mr. Howell a chance in January 2019, and he took this opportunity and ran with it better than most thought he could or would. Mr. Howell's conduct was exemplary and led to this Court reducing

his release conditions on two occasions. In addition, he received no pretrial release violations. Now, Mr. Howell is asking for another chance - one that he is in dire need of.

Currently, Mr. Howell is eligible for release on July 28, 2023, which is next summer. Thus, Mr. Howell served approximately more than seventy percent (70%) of his sentence with good time calculations. Mr. Howell remains incarcerated for nearly two years since his initial request for compassionate release, and this Court's last ruling occurred more than seven months ago. Since then, he has been re-infected with COVID-19 and his CKD continues to attack his kidneys and body.

**The Re-Entry Plan**

Mr. Howell requests to be released to the home confinement with any conditions this Court sees fit to fashion, so long as he is able to attend to his medical conditions. Mr. Howell proposes that he reside with Mariana Ford, his fiancé, at 1 Hitchcock Circle, Simsbury, Connecticut.  Ms. Ford currently resides with her and Mr. Howell's seven-year-old son, Bless. Ms. Ford is gainfully employed as a nursing assistant and has been employed in this field for well over twelve years. This Court will recall Mr. Howell resided with Ms. Ford and their son while he was on pretrial release from 2018 – 2019.

**Conclusion**

Each day that passes has profound implications on Mr. Howell's life and health. Weighing the 3553(a) factors against this backdrop bodes in favor of a sentence reduction in some manner for Mr. Howell. With the parsimony principle firmly in hand, we must never forget:

> Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge. While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of "the diverse frailties of humankind." In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. §3553(a), a sentencing judge must have a "generosity of spirit, that

compassion which causes one to know what it is like to be in trouble and in pain."

United States v. Singh, 877 F.3d 107, 122 (2d Cir. 2017)(internal citations omitted)(emphasis added). Citing Guido Calabresi, the Singh court noted "Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart." Id.

>
> Respectfully Submitted,
> THE DEFENDANT,
> RUFUS HOWELL
> BY: __/s/_____
>     STEVEN B. RASILE
>     681 State Street
>     New Haven, CT 06511
>     Tel(203) 777-7755
>     Fax(203) 367-0493
>     Bar Id No.: ct23228
>     Steve@zandc-law.com

## CERTIFICATION

Pursuant to the Court's designation of this matter as an electronically filed case, and in accordance with the requirements for certification of service in such cases, the undersigned certifies that the foregoing document was filed electronically on the 19th day of January 2022 notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

> BY: ___/s/*Steven B. Rasile*_____
>     Steven B. Rasile